1
2
3
4
5
6
7
8
IN THE UNITED STATES DISTRICT COURT

9
FOR THE EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| SCOTT P. MCKINSTRY, | Case No. 1:13-cv-00088 AWI MJS (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| K. CHAPPELL, | |
| Respondent. | |

17

18    Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas

19  corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Tami Krenzin of the

20  office of the California Attorney General. The parties declined magistrate judge

21  jurisdiction. (ECF Nos. 8, 14.)

22  **I.    PROCEDURAL BACKGROUND**

23    Petitioner is currently in the custody of the California Department of Corrections

24  pursuant to a judgment of the Superior Court of California, County of Merced, following

25  his conviction by jury trial on December 16, 2008, for second degree murder with various

26  enhancements. (Clerk's Tr. at 669-72.) On June 19, 2009, Petitioner was sentenced to

27  an indeterminate term of fifty-one (51) years to life in state prison. (Id.)

28    Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

1   District, on April 14, 2010. (Lodged Doc. 2.) On March 7, 2011 the appellate court

2   affirmed the conviction. (Lodged Doc. 1.) Petitioner sought review by the California

3   Supreme Court on April 19, 2011. (Lodged Doc. 5.) The petition for review was

4   summarily denied on June 8, 2011. (Lodged Doc. 6.)

5        Petitioner then sought collateral relief in the form of a petition for writ of habeas

6   corpus filed with the California Supreme Court on September 7, 2012. (Lodged Doc. 7.)

7   The petition was denied on November 20, 2012. (Lodged Doc. 8.)

8        Petitioner filed his federal habeas petition on January 11, 2013. (Pet., ECF No. 1.)

9   Petitioner raised the following four claims for relief:

10        1) That the trial court violated his right to a speedy trial under the Sixth and

11   Fourteenth Amendments;

12        2) The trial court violated his Sixth and Fourteenth Amendment rights by not

13   dismissing a non-English speaking juror;

14        3) That the trial court violated Petitioner's Constitutional rights by denying

15   Petitioner's motion to unseal personal juror identifying information; and

16        4) That the trial court erred by instructing the jury on an invalid theory for second

17   degree murder.

18        Respondent filed an answer to the petition on June 5, 2013. (Answer, ECF No.

19   17.) Petitioner filed a traverse to the answer on June 19, 2013. (Traverse, ECF No. 19.)

20   **II.**   **STATEMENT OF THE FACTS**[1]

21        Defendant and his girlfriend, Stephanie Sarabia Day, lived together
in Livingston. They started seeing each other in March 1995. Defendant
22   was a tow truck driver and Stephanie worked at a bank. Defendant knew
many Livingston police officers because of his contact with them in the
23   course of his work, such as when officers impounded vehicles and called
for a tow.
24
25        On October 27, 1995, defendant came into the police department
with a gun, a Japanese police model .38 special. He said he had received
26   the gun as payment for a tow, and he wanted to make sure it was not

27   _____
[1] The Fifth District Court of Appeal's summary of the facts in its March 7, 2011 opinion is presumed correct.
28 U.S.C. § 2254(e)(1).

28

2

stolen or used in a crime. Officer Harbin, who knew defendant, ran a background check on the serial number, determined the gun was clear, and wrote up a report. Officer Harbin went to his sergeant and asked him what he should do with the gun. The sergeant told him it was payment for services rendered and he should give it back to defendant.

On January 5, 1996, defendant told Shannon Millican he was going to celebrate his birthday that night with some friends at a nightclub in Modesto called Gilligan's. Shannon had met defendant at a pool hall in April 1995, and they had had sexual intercourse at a hotel in October 1995. During the time Shannon knew defendant, he never told her he was seeing someone else, had another girlfriend, or was living with someone. Shannon had his pager number, but not his telephone number. She would page him and he would call her back. Defendant did not invite her to Gilligan's that night, but she and a couple of her friends decided to show up.

At about 10:00 p.m. that night, defendant and Stephanie arrived at Gilligan's with defendant's friend, Officer Paul Carmona, and his girlfriend, Barbara. Officer Carmona and defendant had met through their contact at work. Gilligan's was a large warehouse converted into a nightclub. A lot of people were there and the music was loud. Defendant, Officer Carmona, and Stephanie were all drinking, but Barbara was not. Defendant had several drinks.

Shannon saw defendant with a group of people and she approached and greeted him, then went to another area of the nightclub. At some point, she saw Stephanie in the restroom, and Stephanie told her she was defendant's girlfriend. Shannon did not mention her relationship with defendant, but she left the restroom and confronted him. She approached him and said, "How would your girlfriend like to know about me?" Defendant insisted he did not have a girlfriend and did not know what she was talking about. Defendant was with John Mardakis, who told Shannon that Stephanie was in fact defendant's girlfriend. Shannon returned to defendant and told him that his friend said Stephanie was his girlfriend. Shannon and defendant screamed and cussed at each other. Defendant screamed at Shannon that he did not have a girlfriend, that everybody was mistaken, that he did not live with her, and that they had just dated at one time. Over the course of 30 to 45 minutes, wherever Shannon went in the nightclub, defendant followed and told her again that Stephanie was not his girlfriend and that Shannon did not know what she was talking about. On one occasion, Shannon noticed Stephanie in the vicinity. Shannon and defendant's discussions were getting so loud that the bouncers were noticing them. Shannon was very upset and she was becoming afraid. Her friends escorted her to her car, where she started crying, and then she left by herself. She did not drink any alcohol while she was at the nightclub.

In Officer Carmona's opinion, everything seemed normal between defendant and Stephanie at the nightclub. Officer Carmona, who had experience recognizing the signs of drug use, did not see any signs of methamphetamine use in either defendant or Stephanie.[1] Officer Carmona

---

[1] Officer Carmona testified that the effects of methamphetamine use varied. A habitual user needs to use methamphetamine just to stay normal. A beginner exhibits signs of intoxication, hyperactivity,

(continued…)

3

did not see either of them arguing with another person, but there were times when he was not with them. He did notice that defendant seemed preoccupied and kept going off to be with other people.

Barbara also thought defendant and Stephanie seemed normal that night. She spoke with Stephanie a little, but the music was loud. There were periods of time that defendant and Stephanie would leave and then return. Defendant had several drinks. All four of them left Gilligan's around 12:00 or 12:30 a.m.

At about 1:47 a.m., defendant called the police. He said, "This is Scot[t]. Someone just shot my girlfriend in the face." The dispatcher, who knew defendant, asked, "On a drive-by Scott or what?" Defendant said, "Yeah I'm at home right now and she's ...." The dispatcher interrupted him to say the police were on their way.

When Officer Broughton arrived at defendant's residence, defendant ran into the road to flag him down. The gates to the driveway were completely open. Defendant was excited and distressed. He said Stephanie had been shot and he led Officer Broughton into the master bedroom, where Stephanie was lying on the bed with a towel or cloth on her head. She was bleeding heavily, but she had a pulse and she was still breathing. She was gurgling, as though liquid was obstructing her airway. She did not utter any words. Officer Broughton and defendant both attempted to keep pressure on her wound. Within five minutes, firemen arrived and moved Stephanie to the floor. Officer Broughton asked for Stephanie's identification. He remembered that defendant left the room at some point, but he did not know who handed him Stephanie's driver's license. In about 10 or 15 minutes, Stephanie was removed from the scene.

Officer Broughton observed a large blood stain on the bed where Stephanie had lain, and he also saw blood on a pillow in the living room.

After the firemen's arrival, Officer Broughton spoke briefly with defendant, who was wearing jeans and a T-shirt. Defendant said he and Stephanie had been out drinking for his birthday. When they got home, Stephanie told him she was going to the store to get something to drink. Defendant went into the house to use the bathroom and he heard what he believed was a gunshot. He ran outside and found Stephanie face down next to the car, which was now facing the street, positioned to leave through the gates. He carried her into the living room and laid her on the floor, then moved her into the bedroom. Defendant said there were only two firearms in the house, a shotgun in the corner of the bedroom and a small-caliber handgun under the mattress.

When Officer Moore arrived, the gates to the property were open

---

(…continued)

excessive talking, teeth grinding, eye twitching, and pupil dilation. Methamphetamine users can, but do not necessarily, become violent. They do not become suicidal unless they are using another drug as well.

On cross-examination, Officer Carmona explained that methamphetamine is not a hallucinogenic drug, but it can cause people to become paranoid and possibly violent. If a petite female beginner ingested a large amount quickly, it could have a big impact on her body.

4

and a compact car was in the driveway pointing toward the street. Officer Moore knew defendant because he interacted with him in the course of his work. Officer Moore secured the front of the residence and stayed outside to control the scene.

Defendant came outside and stood by Officer Moore. Defendant was visibly upset and crying. He told Officer Moore that he and Stephanie had just returned from Modesto, where they had gone drinking with some other people. Defendant fell asleep in the car and woke up when they got home. He opened the gates and Stephanie drove the car in. He got back in and she drove around to the back of the house. As they were getting out of the car, Stephanie said she wanted to go to the convenience store to get something to drink. Defendant went inside to use the bathroom. As he was coming out of the bathroom, he heard a gunshot. He looked out the front door and saw the car, which was still running with the lights on, and Stephanie lying on the ground. When he approached her, he saw she was bleeding. He reached into the car and turned off the lights and engine. He picked up Stephanie, took her into the house, and called 911.

After Stephanie was removed and the scene was stabilized, Officer Broughton took defendant to his patrol car and recorded a conversation with him. Defendant said he and Stephanie went to Modesto to meet Officer Carmona and his girlfriend. Defendant drank at the nightclub, but Stephanie was the designated driver so she had only one beer. They left Gilligan's at about 12:30 or 12:35 a.m. and came straight home. Defendant slept all the way home until Stephanie slowed down and pulled into the driveway. At that point, defendant got out and opened the gates. After Stephanie drove through, he closed the gates and got back in the car. She drove around to the back of the house and parked. She turned off the car and they both got out. She told defendant she wanted to go to the convenience store because she was "a little bit thirsty because she drank that beer and said she had cottonmouth." Defendant explained that did not know what she wanted to drink. There were drinks in the house, but he knew she liked Pepsi and he did not have any. She got back in the car and defendant entered the back door of the house. He heard her start the car. He walked through the house and used the bathroom. As he walked out, he heard what sounded like a gunshot. He ran outside and saw Stephanie lying on the front lawn. The car was running, the headlights were on, and the car door was open. He explained that Stephanie must have walked from the car to the gates because the gates were open. Defendant went to her, then realized the car was in neutral and rolling backward. He turned off the car's engine and lights. He returned to Stephanie, grabbed her, and tried to talk to her. He could not see because it was dark, but he did see blood on her hair. He asked her if she knew who he was and she responded that he was Scott. She was gurgling and she spoke as if she had had a stroke. She said her eyes hurt. Defendant could not see where the blood was coming from. He picked her up and carried her into the living room and laid her on a pillow. He repeatedly asked her to say his name and she did. He did not want to leave her, so he took her to the bedroom. She was still gurgling, but she had quit talking and could not move. He laid her on the bed and checked her again. He grabbed a towel from the bathroom floor and wiped the blood from her head. Then he could see the hole over her eye. He did not leave her until he went outside to flag down Officer Broughton. Defendant stated that he and Stephanie did not fight that day.

5

Defendant was upset and emotional during the interview. By the end of it, he was distressed and began to hyperventilate and rub his hands together, apparently realizing he had blood on his hands and shirt. Officer Broughton was afraid defendant was going to pass out. Medical personnel gave him oxygen and washed the blood off his hands. An officer brought him a clean shirt from the house. He was standing outside in the cold, so Officer Broughton instructed that he be taken to the police station and defendant agreed. At some point, Officer Broughton took a gunshot residue sample from defendant's hands.

Detective Brown arrived at the scene around 2:20 a.m., when defendant was hyperventilating at the curb and being treated by the fire department personnel.

Detective Brown asked defendant about any firearms other than those found in the house. Defendant told him there were no other firearms. In the house, officers found ammunition for both the .12-gauge shotgun and the .25-caliber handgun, but they found no .38-caliber ammunition. Defendant was extremely agitated or upset, but he seemed to calm down a little.

Officer Moore spoke to neighbors in the six nearby residences. No one had seen anything, although one neighbor had heard an unusual noise.

Officer Moore took defendant to the police department in his patrol car. It was Officer Moore's habit, custom, and protocol for officer safety to pat down every person he transported in his patrol vehicle. He did not, however, specifically remember patting defendant down that night.

Detective Brown described defendant's residence for the jury as they watched a video. He described the large lot, the gates, and the turn-around driveway. The area was extremely dark. There were no lights illuminated on the property (the driveway landscape lights did not work and the porch light was turned off) and there were no street lights. Stephanie's car was in front of the house, pointing toward the street, which was 103 feet away. The car was dirty and there were no marks on it to indicate anyone had bumped or pressed up against it in a struggle. In the soft ground, there appeared to be heel drag marks, suggesting a person fell down near the car and was dragged toward the front door. There were shoe impressions just outside the car. Blood was on the ground, the car door handle, and the driver's side of the steering column. Blood splatters tracked from the blood stain on the ground up to the front door. Inside, blood splatters led into the living room, where Detective Brown believed Stephanie was laid. The blood then led through the kitchen and into the master bedroom, where there was a lot of blood and some brain matter on the mattress. In the master bathroom, there was some blood that might have been cast off while someone was washing bloody hands.

A purse was on the bed in the master bedroom. Inside the purse was a small baggie containing a white substance, which was found to be 0.14 grams of methamphetamine.

Officer Harbin impounded and searched the car, which was registered to Stephanie. The car contained numerous clothing articles, shoes, mail, bills, sunglasses, and some trash.

At about 2:30 a.m., Officer Carmona got a call to come to the police station in Livingston in his official capacity. When he arrived, he saw defendant there.

At 3:55 a.m., Officer Broughton interviewed defendant at the police station. Officer Carmona was present at the interview. Defendant explained that he and Stephanie arrived at Gilligan's at about 10:00 p.m. Stephanie was the designated driver for the return trip. Defendant drank beer and three shots. They left around 12:30 a.m. Defendant passed out when they got on the freeway and woke up when they got to the lights of Livingston. He just lay there until they got to the house, at which point he got out and opened the gates. Stephanie drove in, defendant closed the gates, and got back in. She pulled around to the back and they both got out. Then she told him she was going to the store to get something to drink. She was going to get some bottled water, which she usually drank. Defendant entered the unlocked back door and walked to the bathroom. He was just leaving the bathroom when he heard the pop. He immediately ran outside and saw Stephanie lying face up on the ground. There were lights on the driveway, so it was not dark outside. The car was still running. He asked Stephanie what was wrong, but the car started rolling backward toward them (it would have rolled over Stephanie's feet), so he got in and turned off the car. That was when he realized the gates had been opened. He got out and shut the car door. He could tell Stephanie's face was dark and she was gurgling. He talked to her and asked if she was alright. She gurgled, but could not speak. He asked her if she knew who he was and she tried to answer "Scott" but it was as though she could not speak. Defendant picked her up and put her head by his shoulder. As he carried her, he asked her to help him. She moved her legs and was trying to walk, but her legs were dragging. Once inside the living room, defendant could see all the blood. Stephanie quit saying his name. He carried her into the bedroom so he could put her on the bed and call 911. He put a towel on her face and could now see that she was bleeding from a hole. When he grabbed the telephone, Stephanie tried to grab it. He kept asking her if she was okay and she kept saying that her eyes hurt. He called 911.

Officer Broughton asked defendant if he or Stephanie had experienced trouble with anyone recently. Defendant had made a citizen's arrest on someone and his dog had bitten someone. Defendant also mentioned someone Stephanie was having trouble with at work. When Officer Broughton asked whether there were any problems between defendant and Stephanie, defendant said they did not argue while they were out that night or after they got home. He then admitted there was a girl at the nightclub who "got in [his] ass a little bit ...." He explained that the girl was angry "because I set her up with a buddy of mine, and my buddy's got a girlfriend and she came up and chewed my ass because I set her up and set him up, I set her up with a guy who had a girlfriend. [¶] ... [¶] She just told me I was a piece of shit."

Officer Broughton told defendant it struck him as odd that Stephanie would stop the car in front of the porch (near the house and far from the gates), where she would have to walk all the way to the gates to open them, then all the way back to the car, rather than drive up to the gate, open it, and drive out. Defendant answered that he had never seen Stephanie open the gates when she left in the mornings so he did not

exactly know her standard method of opening them.

Later in the morning, defendant asked Officer Carmona to take him to the hospital. They got to the hospital around 6:00 a.m., and stayed for one and one-half or two hours. Defendant kept telling Officer Carmona he could not believe that this had happened, that someone would do this to Stephanie. Officer Carmona did not recall defendant's crying or appearing distraught. Officer Carmona took defendant to his father's house in Modesto, as defendant requested.

Officer Johnston was called to the hospital. At about 6:00 a.m., he met Detective Brown and they went into the neurotrauma unit, where Stephanie had been stabilized. Officer Johnston took gunshot residue samples from her hands.

Officer Johnston then joined the ongoing search at defendant's residence. In a bathroom near the back door, he found a blue and black flannel shirt jacket with a quilted lining—with blood, dirt, water, and cobwebs on it—stuffed behind the door.

Several officers searched the large lot using metal detectors, but no gun was found. The presence of other metal—such as the metal fence, metal poles on the ground, and nine vehicles—caused interference because the detectors responded to metal within five or eight feet.

Later that day, Herman Hoerth told the police that on about January 3, 1996, he saw defendant with a .38 revolver. Defendant took the gun out of his truck and showed it to him. It was in a leather case. Defendant told Herman he got the gun in a trade for a tow.

Stephanie died that evening, about 17 hours after the shooting.

At some point, defendant went to the home of a friend, Edward Arellano, and told him that his girlfriend had been shot in a drive-by shooting by a "load of Mexican guys [who] pulled up and shot" her soon after she and defendant got out of the car. Arellano did not recall his mentioning that Stephanie died. Arellano thought defendant seemed nervous, shaken up, and a bit paranoid. Defendant was with a man named John.

On January 7, 1996, the officers ended their search of the residence at about 6:00 p.m. They left a message with defendant's parents that they needed to speak with defendant.

On the morning of January 8, 1996, defendant came to the police station with his father. Defendant was interviewed again, this time by Detective Brown. Defendant explained that he and Stephanie went out to Gilligan's with Officer Carmona and his girlfriend. They met defendant's friend, John Mardakis. Defendant had two or three beers and three shots. Defendant and Stephanie left at 12:30 or 12:45 a.m. and they went straight home. Defendant slept most of the way and woke up when they reached the lights of Livingston. Stephanie said she was going to stop and get something to drink, but defendant convinced her to take him home because he had to use the bathroom. Defendant opened the gate. The porch light was not on, but they had "little lights that mark the driveway." Stephanie drove around to the back of the house. When she got out of the

car, she told him she was going to go back to the store. Defendant explained that Stephanie usually drank bottled water and she would not have wanted any other drink, including the ones that were in the house, right before going to bed. Defendant went into the house through the back door. While he hurriedly walked to the bathroom, he heard Stephanie start the car. While he was urinating in the bathroom, he heard a pop. He went into the living room, opened the front door, and saw Stephanie lying face up in the front yard. He ran outside and asked her what was wrong. The car rolled a little, so he reached in and turned the ignition off. The gates were opened enough for her to drive through. (He later opened them fully when he was expecting the police.) He grabbed Stephanie and could see that her face was dark. He picked her up and carried her into the house. He laid her in the living room, then moved her into the bedroom. She said that she had to go to the bathroom, that her eyes hurt, and that she needed to get her contacts out. He took a towel from the bedroom floor and put it on her head. She talked to him and kept grabbing onto him. He tried to hold her and hug her. When she quit talking to him, he called 911. He hung up the telephone and almost immediately heard the siren. He ran outside and waved down the officer.

Defendant explained that a girl named Shannon was at Gilligan's that night. He did not remember her last name or have her telephone number. He recognized her and she greeted him. Defendant's friend, John, was interested in meeting her, so defendant introduced them and walked away. That night, he and Stephanie were apart only when one of them was in the restroom.

Detective Brown told defendant he did not believe his story and he was going to charge him with murder. He told defendant he should help himself by telling the truth. Defendant seemed frightened. Defendant said he did not have the .38-caliber revolver anymore because the man who gave it to him had called for it. Defendant could not provide an approximate time frame for the call. Detective Brown said he knew defendant had tried to sell the gun to someone on Wednesday, two days before the shooting. Defendant sobbed and trembled, and said, "I didn't shoot her!" He admitted showing the gun to a friend, but he denied trying to sell it to him. He also admitted fighting with Stephanie. She was mad and they argued while they were stopped at a light. She accused him of cheating with Shannon. At home in the driveway, Stephanie was getting ready to leave him. She had the gun when they went out to the car. He grabbed and opened the car door and asked her where she was going. He did not want her to leave. She said she did not believe that he had not cheated on her. She was very mad. She got out of the car and yelled at him. She had the gun, so defendant backed away. She said he cheated on her and she was not going to put up with it. She was waving the gun around and screaming. (Defendant explained to Detective Brown that she carried a .25-caliber gun (the one under the mattress) all the time.) Defendant was standing between the car and Stephanie. He grabbed the gun from her because he did not want to get shot and he did not want her to get shot. She grabbed him and he tried to pull away from her. She had the handle of the gun and his hands were around her hand. She was yelling at him. He tried to turn the gun, but it went off and she fell right by the car. He explained, "I didn't shoot her ... I was just ... it just ... POW ... it ...." He was not trying to point the gun at her. She just kept thrashing around and they both had their hands on the gun. He should have just let her go, but he did not want her to leave. Their relationship had been going

9

well and they never had any problems. She always asked him not to cheat on her because she had been hurt in previous relationships, and he told her he never would. He tried to give her everything she wanted. He did not cheat on her; he just knew Shannon and tried to set her up with his friend.

Detective Brown asked defendant where the gun was, but defendant would not answer. He said no one would believe him anyway. He said he felt bad because he gave Stephanie the gun. Finally, he explained that he went back outside for the gun after he put Stephanie in the bedroom. The holster was in the car. He had already called 911 and he could hear the sirens. It happened so fast. But still, defendant would not reveal the gun's location. He explained: "I owe it to her to try and save her face. She was not that mad, it didn't happen, we [didn't] have the argument. She didn't pull out the gun, don't they owe that to her[?] Her own people, the family." Eventually, defendant said the gun was still at the house. He said he buried it with his hands and had not touched it since, but he would not divulge its location. An officer asked him why he refused, and he answered, "It's not that I don't [want] to tell you guys. Just that I'm trying to figure out what to do." An officer encouraged him to help them. Defendant said he was trying to. When an officer asked if defendant would take them to the gun, he said, "I don't want you guys to think that I was hiding it ...." He explained that he had lied about the whole thing because it was easier to believe that it had not happened and that a "stupid asshole" had done it. Detective Brown asked him if the gun was on his property. Defendant responded, "Oh God, I didn't shoot her. I just didn't shoot her!" Detective Brown said they would go to the residence to retrieve the gun, and he concluded the interview.[2]

Officer Johnston and some other officers returned to the residence with defendant. Defendant pointed to an area in the rear of the backyard with a big piece of concrete, metal pipe, and shrubbery. The officers recovered the gun in a shoulder holster, directly beneath a downed metal clothesline post.

The same day, a forensic pathologist performed an autopsy on Stephanie's body. He observed a gunshot wound above her right eye, which he determined was the cause of her death. He also observed bruising to her arms, but he explained that it was common for ordinary handling at the hospital to cause such bruises on a dying body. In addition, he saw a faint discoloration on her right hand near her ring finger.

The pathologist explained that gunshot wounds are classified into four types—(1) contact/near-contact, (2) close range (a couple of inches away), (3) intermediate range (eight to 18 inches away), and (4) distant range (18 or more inches away). Contact/near-contact wounds result in the deposition of a black sooty material on the skin (which can be washed off) and a stellate appearance to the wound, but no powder stippling. When a gun is fired while contacting or nearly contacting the skin, an

_____

[2] Detective Brown testified that he used bluffs during the interview in an attempt to provoke defendant into revealing more information.

On cross-examination, Detective Brown admitted that some of his suspicions were later contradicted. Stephanie's purse was in the bedroom, but he later learned it had been brought inside. The discolored water in the bathtub was feline blood, not blood washed from defendant's hands. The bruises on Stephanie's arms might have been caused by being carried.

expanding ball of hot gas immediately follows the bullet into the tissue, tearing the tissue and causing a stellate appearance to the wound. The hot gas can also dissect the skin away from the bone, causing a hemorrhage between them. Close-range wounds exhibit both black soot and powder stippling (which, unlike the soot, cannot be washed off). Intermediate-range wounds result in powder stippling only. Distant-range wounds exhibit only a bullet strike, with no soot or stippling.

Because Stephanie's wound had no soot and no stippling, it was either a contact/near-contact wound from which the soot had been cleaned away or a distant-range wound. Based on the stellate pattern of the wound and the hemorrhage between the skin and the bone, the pathologist favored the conclusion that the wound was a contact/near-contact wound from which the soot had been cleaned away. He did, however, explain that a wound to the bony prominence over the eye can result in a stellate pattern, complicating a pathologist's determination whether a wound is in fact a contact/near-contact wound. What convinced him that Stephanie's wound was a contact/near-contact wound was the large hemorrhage (the size of his hand) between the skin and the bone that he observed when he reflected Stephanie's scalp.

The pathologist determined that the bullet travelled straight from the front of Stephanie's head to the back and slightly upward, lodging in her brain. The wound would have rendered her unconscious instantly and then her brain activity would have ceased within seconds. She might have exhibited seizure activity, but she would not have been able to use her limbs in any meaningful manner. The pathologist believed she would not have been able to speak a single word. On cross-examination, the pathologist explained that a person not medically trained might perceive seizure activity following a shooting as a sign that the victim is still capable of moving. Similarly, the victim could make some gurgling and gasping sounds that could cause their lips to move.

The pathologist explained that contact/near-contact wounds to the head are not usually seen in homicides because victims generally will not allow someone to put a gun to their head. They usually back away or move their head. But in suicides, contact/near-contact wounds are very common; however, in 95 percent of those cases, the wound is to the side of the head, under the chin, or in the mouth. On cross-examination, the pathologist agreed that if a person who was holding a gun to the side of her own head (which is typical in suicides) turned her head straight into the gun, she would be shot straight in the forehead.

The pathologist demonstrated how the gun could have created a wound like Stephanie's. When he did so, he noted that he had trouble reaching the trigger. He explained that if someone grabbed his hands or the gun and they struggled, the movement would change the nature of the wound. In the pathologist's experience, struggles usually result in wounds to the chest and abdomen, and only rarely to the head. In a struggle, the gun gets pushed up or down, away from the head.

Stephanie's blood was found to contain 0.10 milligrams of methamphetamine per liter. Drugs she received at the hospital would have diminished her body's ability to metabolize the methamphetamine, and it was not possible to extrapolate from her postmortem methamphetamine blood concentration what her methamphetamine blood concentration had

been 17 hours before she died. On cross-examination, the pathologist agreed that 17 hours before her death, her blood contained at least as much methamphetamine (but possibly the same amount) as it did at the time of her autopsy.

A forensic toxicologist testified that in a low-level or recreational user, a methamphetamine concentration of 0.10 to 0.20 milligrams per liter would cause euphoria and greater alertness and focus. This euphoric state would last about six hours, although chronic users would experience a shorter euphoric state. After the euphoric state, chronic users could exhibit aggressive behavior if they were binging.

A criminalist explained that the gun was a double-action .38-caliber revolver in a holster. The trigger of the gun tested positive for blood. The .38-caliber bullet recovered from Stephanie's brain had been fired by the gun. The gun required four and one-half pounds of force to pull the trigger after manual cocking, and nine and one-half to 11 pounds of force to pull the trigger without manual cocking.

The gunshot residue tests revealed one particle on defendant's right hand and two particles on his left hand, and one particle on Stephanie's right hand and none on her left hand. This type of test could show that a person was in the vicinity (within four to six feet) of a firearm when it was fired, but it could not establish whether a person was holding the firearm or was involved in a struggle. Because the particles could easily be removed or transferred, the test could merely mean that a person handled the firearm later, touched clothing with particles on it, or was exposed to particles in some other manner. There were many ways to come in contact with the particles. Testing for these particles had fallen out of favor because it could not provide enough helpful evidence and the results were often misinterpreted.

A fingerprint expert testified that no fingerprints were found on the gun, which was the case with 95 percent of firearms tested.

Sandra Rice testified that she was married to Stephanie's brother, Steve. Sandra owned the towing business that employed defendant. On January 6, 1996, in the early morning, defendant called her and told her that someone drove by and shot Stephanie when she was going to get some water. He was anxious and talking fast. He told her that the last thing Stephanie uttered was his name. On cross-examination, Sandra said Stephanie told her she had tried methamphetamine once, a long time before the shooting.

Carrie Henshaw testified that she worked at the bank with Stephanie for about three years. Carrie never saw Stephanie using drugs. They were friends and they spent a lot of time together. Except for a couple of arguments, they got along well. But when Stephanie started seeing defendant, Carrie would call and she could hear defendant telling Stephanie to hang up, and she would. Carrie and Stephanie quit spending time together outside of work. On cross-examination, Carrie said Stephanie lost weight after she started seeing defendant. Stephanie once made a threat against Carrie to another employee, but they got over it.

Prior Domestic Violence Evidence

Katina Connel, who was granted immunity, testified that she met defendant when she was 17 years old. They became involved and moved in together. On March 20, 1993, when they had been together for about two years and Katina was pregnant with defendant's child, they got into an argument. At some point, Katina decided to leave. Defendant did not want her to leave, so he pulled her arm, hair, and clothing. He pulled her back into the house and hit her repeatedly on her face and upper body. She sat on the floor on some cushions, her face swollen and her nose bleeding. When defendant stopped hitting her, he assembled a shotgun that was on the couch. He verbally taunted her with the gun, telling her he could kill her if he wanted to and no one would do anything about it. She was very frightened. He taunted her, threw a shoe at her, kicked her, and hit her some more. Then he picked up the gun again, held the barrel about eight inches from her leg, and fired the gun, hitting the floor just a few inches from her. Eventually, she was able to leave the house by convincing defendant she was going to a friend's house to shower because they did not have running water in the bathroom at the time. When she left, she went straight to her parents' house and told them what happened. She did not call the police because defendant had told her many times he would hurt her family members. But Katina's parents did call the police and Katina told the police the truth about the assault. Defendant was arrested. He was convicted of shooting a firearm in a grossly negligent manner (§ 246.3, a felony) and he pled guilty to domestic violence against Katina (§ 243, subd. (e), a misdemeanor).

Defendant called Katina many times from jail, instructing her to tell his attorneys she had exaggerated the incident. Defendant told her he was facing so much jail time and she should try to get him out so he could be there when their child was born. Defendant scared her when he told her that if she refused, John Mardakis would "take care of things if they needed to be taken care of." Katina had met John, been to his house, and seen and heard things about him that scared her. John was a little high-strung and he said things that were inappropriate and scary. He would talk about things he could do to people with his guns, snakes, and books on torture and killing. She took defendant's comments to mean that John might poison her through the mail or do one of the other things she had seen and heard about. She decided to contact the attorneys as defendant instructed. She signed a declaration stating everything she had told the police was greatly exaggerated and defendant had not threatened her with a firearm or threatened to harm her family. Katina signed the declaration to protect herself and her family because she was afraid of defendant.

When defendant got out of jail, Katina resumed her relationship with him for a few months. But eventually she was able to break off the relationship and she ultimately married someone else. She had had no contact with defendant since their breakup.

Katina admitted she owed a lot of money in 1993. In March 1993, she was involved with defendant in a plan to burn her car for insurance money. Defendant told her she could not have the baby if she still had the car and the car payment. But she then told the truth and her parents took care of getting her out of trouble.

In December 2005, Katina was rear-ended and she received an insurance payment. In January 2006, her car caught fire in her driveway during the night, damaging the awning of the garage. She did not have

coverage for the fire, so she did not file a claim and she received no insurance payment for the loss.

Defense Evidence

On March 20, 1993, Officer Protine and his trainee were called out to a house in Modesto. The officers interviewed Katina. Officer Protine did not remember Katina's telling him that defendant said he could kill her at any time and no one would ever find out, or that defendant taunted her with a gun. Officer Protine would have included this information in his report.

On cross-examination, Officer Protine stated that Katina told him she tried to leave after an argument. Defendant dragged her back into the house and hit her seven to 10 times with a closed fist. She said he assembled a shotgun while she was crying and holding her face, and then he pointed it at her and fired it. The gunshot hit the floor about eight to 10 inches from her foot. She told Officer Protine she was afraid defendant was going to kill her, and she was afraid he would hurt her or her family because he had made threats in the past. He had beaten her the week before too. She told the officers she was pregnant with defendant's child. Officer Protine saw the injuries on her face and leg and the dried blood on her nose. Katina later sought medical treatment.

After speaking to Katina, the officers went to defendant's house. They saw the bloody cushions on the floor that Katina had described. They found a hole in the floor, apparently made by the gunshot, about six inches in front of the cushions. When Officer Protine asked defendant about the incident, he was calm and he completely denied beating Katina. He suggested that someone else beat her up. Officer Protine found the shotgun at defendant's house.

While the officers were at defendant's house, Katina came back for her things. Officer Protine had found some property from a car and Katina became hysterical. She told Officer Protine she had been forced to be part of a conspiracy.

Robert Wildman, an attorney, prepared the motion to modify defendant's probation in 1993. After defendant made a plea bargain, Katina came into Wildman's office. She was very emotional and upset. She told Wildman she wanted to get defendant out of jail. Wildman told her the only way to do that was to file a motion to modify defendant's probation. He told her to write a letter to the judge. The motion was filed with the court and a hearing was set, although it was never held. Wildman thought the district attorney submitted on the declaration and the judge modified the terms of defendant's probation.

Greg Davis, a fire investigator, testified that on January 3, 2006, at 2:52 a.m., the Modesto Fire Department responded to a vehicle fire at Katina's house. Davis's partner, Doug Machado, had begun the investigation, but he came to Davis and told him he had a history with both Katina and defendant. He asked Davis to take over the investigation. During the course of the investigation, the fire investigators called Katina repeatedly and finally reached her at work. She never came into the office for a taped interview.

On cross-examination, the fire investigator stated that the case was closed because they had no information or leads, and Katina had left the state and was not pursuing the case. The fire investigator testified that his wife knew and worked with Katina, and Machado knew defendant. Machado told Davis he knew both defendant and Katina, and he wanted someone else to finish the case.

John Mardakis testified that he had known defendant since about 1988. They had been friends for a long time. John met Katina when she was dating defendant, but he did not spend substantial time with her. John had served in the military from 1991 through 1994, and he was familiar with firearms, but he never spoke to Katina in a threatening way and he never spoke to her about torturing animals or people.

John knew Stephanie for about one year, when she was defendant's girlfriend. When he saw her at Gilligan's on January 5, 1996, he noticed she was a lot thinner. That evening, a blond woman walked by and John thought she was pretty. He talked to defendant about her and John eventually met Shannon. Later in the evening, Shannon and Stephanie were standing right next to John, talking to each other. At some point, Shannon asked John if defendant had a girlfriend. She was very angry and John did not want to "get yelled at too," so he told her he was not sure. Then she and Stephanie both yelled at defendant. Defendant backed up and looked nervous. John did not see defendant follow Shannon around and scream at her. When defendant and Stephanie were preparing to leave, John could tell Stephanie was angry. She had her arms crossed and was "just eyeballing" defendant. John said goodbye to her but she did not respond. She continued staring at defendant and John assumed there would be trouble. After defendant and Stephanie left, John went back into the nightclub and spoke to Shannon. She was upset and crying. He felt bad and tried to console her. He followed her home because of the heavy fog.

On cross-examination, John explained that he had several conversations with Stephanie that evening. She was talkative and friendly, and they got along. He had met her several times and he thought she was very nice. That night, she asked him to teach her how to shoot because defendant had refused. John believed that he, Shannon, and Stephanie all sat at a table together for a while. The conversation was amiable and the women talked about clothes. John did not detect any hostility or anything out of the ordinary. At some point, John saw defendant speaking with Shannon, but they were 40 to 50 feet away. Shannon was shaking her finger at defendant. In fact, both Shannon and Stephanie were yelling at defendant and pointing their fingers at him at the same time. John was not present when the women yelled at defendant; he could only see what was happening. The noise in the nightclub made it difficult to hear people who were more than a few feet away. John knew not to get involved when Shannon came to him and yelled, "Does he have a girlfriend?" But he thought he did tell her later that defendant had a girlfriend.

John testified that he had taught defendant how to shoot and they had gone shooting together. John used to have a number of firearms.

Another forensic toxicologist determined that Stephanie's blood contained 0.10 milligrams methamphetamine per liter, and her vitreous humor contained 0.03 milligrams methamphetamine per liter. The vitreous

humor concentration would be closer to the circulating concentration before death. The concentration of 0.03 milligrams per liter was in the middle of the therapeutic range for methamphetamine when used to treat attention deficit disorder. On cross-examination, the toxicologist explained it was difficult to estimate the blood concentration at the time of death, extrapolating back from the postmortem concentrations, especially when the person was in a state of trauma for many hours. He explained that the adverse effects of methamphetamine can start occurring at a concentration of 0.2 to 0.6 milligrams per liter, depending on the user.

A psychiatrist explained that methamphetamine is a sympathomimetic drug (i.e., it mimics the sympathetic nervous system). Initially, it produces a heightened sense of awareness and a sense of euphoria. These are replaced by hyperactivity and lack of focus, then irritability and anxiety. Continued use of the drug produces a suspiciousness and, ultimately, it can cause paranoia and physical violence. In addition, high doses can lead to aggressive and confrontational behavior. When methamphetamine is snorted, the user feels its effects in less than one minute. A person who uses methamphetamine only occasionally could generally function at a job and even hide their use from a mate, although the user may lose weight and be easily annoyed.

In the psychiatrist's opinion, Stephanie's possession of 0.14 grams of methamphetamine (about 28 doses), her weight loss, her threat against a female coworker, and her statement to her sister-in-law that she had tried methamphetamine were indicia of possible drug abuse. Due to the fluids and drugs Stephanie received in the hospital, the psychiatrist believed the concentration of methamphetamine in her blood would have been significantly higher at the time she was shot compared to the time of her autopsy.

Rebuttal Evidence

Karen Underwood testified that she knew Stephanie for about one year. They got along well and were good friends. Stephanie was always positive and upbeat. Karen never saw her use any drugs. Stephanie would usually just drink beer. Karen never saw Stephanie with a gun and never talked about guns with her. Stephanie and defendant lived with Karen for a couple of months, during which time Stephanie and defendant argued a lot. Karen saw bruises on Stephanie once in a while, but she did not know how they were inflicted. Stephanie and defendant moved out in the summer of 1995.

Brenda Rodriguez testified that she worked with Stephanie at the bank for about three years. They were friends and they would see each other outside of work. Stephanie had trained for a new position and was going to be promoted in early 1996. She was happy and very professional. Brenda never saw her engage in any inappropriate behavior at the bank. She always had a good disposition and did not exhibit any mood swings or depression. Brenda, Stephanie, and another employee were always trying to diet and lose weight. In 1995, Stephanie lost five or ten pounds. Brenda never saw Stephanie with a gun and they never talked about guns. Brenda worked with Stephanie on January 5, 1996, her last day at work. They spent all day together. Stephanie was excited and happy. She did not seem nervous, fidgety, or tense. On cross-examination, Brenda said

she was not aware Stephanie had threatened physical violence against a coworker, Carrie. Brenda never saw Stephanie with any drugs. Brenda noted that Stephanie was not a push-over. She stood up for herself.

Kathleen Sivils testified that Stephanie was a longtime friend of Kathleen's daughter. Stephanie was like a daughter to Kathleen and she came to Kathleen's home often. Stephanie was very caring, generous, and nonconfrontational. Kathleen had never seen her yell or scream at anyone. Kathleen had never seen Stephanie shoot a gun and she never talked about guns. As an emergency room nurse, Kathleen was familiar with the symptoms of people under the influence of drugs, and she never saw any signs of methamphetamine use in Stephanie and they never talked about drugs. Stephanie confided in Kathleen about her life. They had many conversations in 1995, and following a conversation on January 3, 1996, Kathleen emptied a bedroom in her house for Stephanie. On cross-examination, Kathleen explained that Stephanie left her previous boyfriend because he used drugs. Stephanie was strictly against drug use and would not tolerate it. Kathleen knew Stephanie had been around guns, but she refused to shoot them and probably did not even know how to load a gun. She never showed an interest in guns.

People v. McKinstry, 2011 Cal. App. Unpub. LEXIS 1549, 9-44 (Cal. App. 5th Dist., Mar. 4, 2011).

## II.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the conviction challenged arises out of the Merced County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court has jurisdiction over the action.

### B.    Legal Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

1   Under AEDPA, an application for a writ of habeas corpus by a person in custody

2   under a judgment of a state court may be granted only for violations of the Constitution

3   or laws of the United States. 28 U.S.C. § 2254(a); Williams v. Taylor, 529 U.S. at 375 n.

4   7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

5   state court proceedings if the state court's adjudication of the claim:

6       (1) resulted in a decision that was contrary to, or involved an
7   unreasonable application of, clearly established federal law, as
    determined by the Supreme Court of the United States; or

8       (2) resulted in a decision that was based on an unreasonable
9   determination of the facts in light of the evidence presented in the State
    court proceeding.

10   28 U.S.C. § 2254(d).

11               1.   Contrary to or an Unreasonable Application of Federal Law

12   A state court decision is "contrary to" federal law if it "applies a rule that

13   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

14   that are materially indistinguishable from" a Supreme Court case, yet reaches a different

15   result." Brown v. Payton, 544 U.S. 133, 141 (2005) citing Williams, 529 U.S. at 405-06.

16   "AEDPA does not require state and federal courts to wait for some nearly identical

17   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

18   even a general standard may be applied in an unreasonable manner" Panetti v.

19   Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted). The

20   "clearly established Federal law" requirement "does not demand more than a 'principle'

21   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009). For a state

22   decision to be an unreasonable application of clearly established federal law under §

23   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

24   (or principles) to the issue before the state court. Lockyer v. Andrade, 538 U.S. 63, 70-

25   71 (2003). A state court decision will involve an "unreasonable application of" federal

26   law only if it is "objectively unreasonable." Id. at 75-76, quoting Williams, 529 U.S. at

27   409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

28   Court further stresses that "an *unreasonable* application of federal law is different from

1  an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing <u>Williams</u>, 529

2  U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks

3  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

4  correctness of the state court's decision."  <u>Id.</u> at 786 (citing <u>Yarborough v. Alvarado</u>, 541

5  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

6  have in reading outcomes in case-by-case determinations."  <u>Id.</u>; <u>Renico v. Lett</u>, 130 S.

7  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

8  Federal law for a state court to decline to apply a specific legal rule that has not been

9  squarely established by this Court."  <u>Knowles v. Mirzayance</u>, 129 S. Ct. 1411, 1419

10  (2009), quoted by <u>Richter</u>, 131 S. Ct. at 786.

11         2.    <u>Review of State Decisions</u>

12         "Where there has been one reasoned state judgment rejecting a federal claim,

13  later unexplained orders upholding that judgment or rejecting the claim rest on the same

14  grounds."  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  This is referred to as the

15  "look through" presumption.  <u>Id.</u> at 804; <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1198

16  (9th Cir. 2006). Determining whether a state court's decision resulted from an

17  unreasonable legal or factual conclusion, "does not require that there be an opinion from

18  the state court explaining the state court's reasoning." <u>Richter</u>, 131 S. Ct. at 784-85.

19  "Where a state court's decision is unaccompanied by an explanation, the habeas

20  petitioner's burden still must be met by showing there was no reasonable basis for the

21  state court to deny relief."  <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does

22  not require a state court to give reasons before its decision can be deemed to have been

23  'adjudicated on the merits.'").

24         <u>Richter</u> instructs that whether the state court decision is reasoned and explained,

25  or merely a summary denial, the approach to evaluating unreasonableness under §

26  2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

27  or theories supported or, as here, could have supported, the state court's decision; then

28  it must ask whether it is possible fairminded jurists could disagree that those arguments

1  or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

2  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

3  was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

4  authority to issue the writ in cases where there is no possibility fairminded jurists could

5  disagree that the state court's decision conflicts with this Court's precedents." Id. To put

6  it yet another way:

> As a condition for obtaining habeas corpus relief from a federal
> court, a state prisoner must show that the state court's ruling on the claim
> being presented in federal court was so lacking in justification that there
> was an error well understood and comprehended in existing law beyond
> any possibility for fairminded disagreement.

10  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

11  are the principal forum for asserting constitutional challenges to state convictions." Id. at

12  787. It follows from this consideration that § 2254(d) "complements the exhaustion

13  requirement and the doctrine of procedural bar to ensure that state proceedings are the

14  central process, not just a preliminary step for later federal habeas proceedings." Id.

15  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

16              3.      Prejudicial Impact of Constitutional Error

17      The prejudicial impact of any constitutional error is assessed by asking whether

18  the error had "a substantial and injurious effect or influence in determining the jury's

19  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

20  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

21  state court recognized the error and reviewed it for harmlessness).  Some constitutional

22  errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v.

23  Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

24  (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

25  assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

26  Strickland prejudice standard is applied and courts do not engage in a separate analysis

27  applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002).  Musalin

28  v. Lamarque, 555 F.3d at 834.

## III.   REVIEW OF PETITION

### A.   Claims 1 through 3 – Procedural Bar

Respondent asserts that the first, second, and third claims presented in the petition are subject to procedural default. Petitioner presented the claims in his petition for writ of habeas corpus filed before California Supreme Court. (Lodged Doc. 7.)

In its decision, the California Supreme Court denied the petition based on a state procedural bar. The court addressed Petitioner's claims as follows:

> The petition for writ of habeas corpus is denied. (See People v. Duvall (1995) 9 Cal.4th 464, 474; In re Waltreus (1965) 62 Cal.2d 218, 225; In re Dixon (1953) 41 Cal.2d 756, 759.)

(Lodged Doc. 8.)

Based on the cases cited by the California Supreme Court, it appears that the California Supreme Court found the claims procedurally barred for failure to raise the claims on direct appeal.

### 1.   Legal Framework for Procedural Default

The Supreme Court recently described the legal requirements that prevent review of claims that were rejected on state court grounds:

> "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' " Kindler, 558 U.S., at 55, 130 S.Ct., at 615 (quoting Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. See Sykes, 433 U.S., at 81-82, 90, 97 S.Ct. 2497.
>
> ***
>
> To qualify as an "adequate" procedural ground, a state rule must be "firmly established and regularly followed." Kindler, 558 U.S., at 60, 130 S.Ct., at 618 (internal quotation marks omitted). FN4 [omitted] "[A] discretionary state procedural rule," we held in Kindler, "can serve as an adequate ground to bar federal habeas review." Ibid. A "rule can be 'firmly established' and 'regularly followed,'" Kindler observed, "even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." Ibid. California's time rule, although discretionary, meets the "firmly established" criterion, as Kindler comprehended that requirement.

Walker v. Martin,      U.S.      , 131 S. Ct. 1120, 1127-1128, 179 L. Ed. 2d 62 (2011)

1   (abrogating <u>Townsend v. Knowles</u>, 562 F.3d 1200 (9th Cir. 2009)).

2               2.       Failure to Raise Claims on Direct Review

3       Claims one, two, and three are potentially procedurally barred by the California

4   Supreme Court's decision to deny state habeas review because the claims were not

5   raised on direct review.

6       Here, the California Supreme Court applied the <u>Dixon</u> rule to deny the claims in

7   the petition. <u>Dixon</u> states that:

8           [t]he general rule is that habeas corpus cannot serve as a substitute for an
            appeal, and, in the absence of special circumstances constituting an
9           excuse for failure to employ that remedy, the writ will not lie where the
            claims errors could have been, but were not, raised upon a timely appeal
10          from the judgment of conviction.

11  41 Cal. 2d at 759. Thus, pursuant to <u>Dixon</u>, a California court will not review the merits of

12  a claim in a state habeas proceeding if it could have been raised in a timely appeal but

13  was not. The Court must determine whether the <u>Dixon</u> rule is an adequate and

14  independent state rule to serve as a procedural bar.

15               a.       Is the <u>Dixon</u> Rule Adequate?

16      The Supreme Court explained that "a discretionary rule can serve as an adequate

17  ground to bar federal habeas review," and that a rule may be adequate "even if the

18  appropriate exercise of discretion may permit consideration of a federal claim in some

19  cases but not others." <u>Beard v. Kindler</u>, 130 S. Ct. 612, 618 (2009); <u>see also</u> <u>Martin</u>, 131

20  S. Ct. at 1128-29. As the Supreme Court recently observed in <u>Martin</u>, 131 S. Ct. at 1130,

21  "[d]iscretion enables a court to home in on case-specific considerations and to avoid the

22  harsh results that sometimes attend consistent application of an unyielding rule." Such

23  discretion is applicable to the <u>Dixon</u> rule because a state court may find that special

24  circumstances excuse a petitioner's failure to raise a ground on appeal. <u>See, e.g.</u>,

25  <u>Fleeman v. Castro</u>, 2009 U.S. Dist. LEXIS 1278, 2009 WL 33241, at *7 (E.D. Cal. Jan. 6,

26  2009) (the <u>Dixon</u> rule is "discretionary in that it admits of the possibility of exceptions for

27  'special circumstances constituting an excuse' for failure to raise a claim by way of direct

28  appeal and when such circumstances are found, the California Supreme Court may

1   entertain the claim"); <u>Jones v. Ayers</u>, 2008 U.S. Dist. LEXIS 26772, 2008 WL 906302, at

2   *28 (E.D. Cal. Mar. 31, 2008) (finding the <u>Dixon</u> rule to be discretionary because, as set

3   forth in <u>Park</u>, 202 F.3d at 1152, the California Supreme Court explained in <u>Harris</u> that

4   exceptions are applicable to the <u>Dixon</u> rule that admit the possibility that the California

5   Supreme Court may entertain a claim not raised on direct appeal). Accordingly, the

6   Court may look to the Supreme Court's recent decision in <u>Martin</u> for guidance in

7   evaluating the adequacy of the state courts' application of the <u>Dixon</u> rule. <u>See, e.g.</u>, <u>Lee</u>

8   <u>v. Mitchell</u>, 2012 U.S. Dist. LEXIS 83503 (C.D. Cal. May 1, 2012); <u>Jensen v. Hernandez</u>,

9   2012 U.S. Dist. LEXIS 45673, 2012 WL 1130599, at *11-12 (E.D. Cal. Mar. 30, 2012)

10  (citing <u>Martin</u> in considering, in part, a <u>Dixon</u> bar); <u>Peyton v. Lopez</u>, 2012 U.S. Dist.

11  LEXIS 50350, 2012 WL 1203484, at *7 (C.D. Cal. Feb. 22, 2012) (same).

12      Second, to be "adequate," the procedural rule in question must be "firmly

13  established and regularly followed." <u>Martin</u>, 131 S.Ct. at 1127 (citing <u>Kindler</u>, 130 S.Ct. at

14  618). "In determining the adequacy of the procedural bar, state cases applying the

15  procedural bar after the time of the petitioner's default are irrelevant." <u>Bennett v. Mueller</u>,

16  364 F. Supp. 2d 1160, 1167 (C.D. Cal. 2005). Here, Petitioner has not presented

17  evidence regarding the regular application of the procedural bar either before or after

18  filing his petition.

19      The United States Supreme Court has made it clear that a state procedural rule

20  can serve as an adequate bar to federal habeas review "even if the appropriate exercise

21  of discretion may permit consideration of a federal claim in some cases but not others."

22  <u>Kindler</u>, 130 S. Ct. at 618; <u>see also</u> <u>Martin</u>, 131 S. Ct. at 1128, 1129 ("We see no reason

23  to reject California's time bar simply because a court may opt to bypass the

24  [untimeliness] assessment and summarily dismiss a petition on the merits, if that is the

25  easier path."). Moreover, as Judge Kozinski recently noted, there is no "existing Ninth

26  Circuit precedent holding that the <u>Dixon</u> rule is inadequate." <u>Cree v. Sisto</u>, 2011 U.S.

27  Dist. LEXIS 3648, 2011 WL 66253, at *2 (E.D. Cal. Jan 7, 2011) (Kozinski, J., sitting by

28  designation).

1       The Court finds that the evidence reflects that the <u>Dixon</u> rule was well established

2   and regularly followed in the time leading up to Petitioner's default.

3                   b.     Is the <u>Dixon</u> Rule an Independent State Ground?

4       Prior to 1998, the <u>Dixon</u> rule was determined to not be independent of federal law.

5   <u>Park v. California</u>, 202 F.3d 1146, 1152-53 (9th Cir. 2000). In <u>Park</u>, the Ninth Circuit

6   reasoned that application of the <u>Dixon</u> rule necessarily was interwoven with federal law

7   because there was a fundamental constitutional error exception to the <u>Dixon</u> rule under

8   state law. <u>See</u> <u>id.</u> at 1152-53. However, in <u>In re Robbins</u>, 18 Cal. 4th 770 (1998), the

9   California Supreme Court held "that henceforth California courts would no longer

10   determine whether an error alleged in a state petition constituted a federal constitutional

11   violation." <u>See</u> <u>Bennett</u>, 322 F.3d at 581. In <u>Bennett</u>, the Ninth Circuit held, "we respect

12   the California Supreme Court's sovereign right to interpret its state constitution

13   independent of federal law" and, as a result found California untimeliness rule was

14   independent. <u>See</u> <u>id.</u> at 581-83. Thus, under these particular circumstances, the

15   California Supreme Court's invocation of <u>Dixon</u> after <u>Robbins</u> was decided would also be

16   an independent state ground. <u>See</u> <u>id.</u> at 582-83; <u>see also</u> <u>Park</u>, 202 F.3d at 1153 n. 4

17   (9th Cir. 2000). <u>See</u> <u>Cree v. Sisto</u>, Civ. No. 08-487, 2011 U.S. Dist. LEXIS 3648, 2011

18   WL 66253, at *2 (E.D. Cal. Jan 7, 2011) (Kozinski, J., sitting by designation); <u>see also</u>

19   <u>Rhodes v. Uribe</u>, 2012 U.S. Dist. LEXIS 36921, 2012 WL 928434, at *4 (C.D. Cal. Feb.

20   10, 2012) (finding that the <u>Dixon</u> rule was independent and adequate); <u>Cantrell v. Evans</u>,

21   2010 U.S. Dist. LEXIS 35955, 2010 WL 1170063, at *13-14 (E.D. Cal. Mar. 23, 2010)

22   (same) (McKeown, J., sitting by designation); <u>Lee v. Mitchell</u>, 2012 U.S. Dist. LEXIS

23   83503 (C.D. Cal. May 1, 2012) (same).

24       As the <u>Dixon</u> rule is an independent and adequate state ground, the petition is

25   deemed procedurally defaulted unless Petitioner can show cause for the default and

26   actual prejudice as a result of the alleged violation of federal law or that failure to

27   consider the claims will result in a fundamental miscarriage of justice. <u>See</u> <u>Coleman</u>, 501

28   U.S. at 750.

1                 2.     Reasons to Overcome Procedural Default

2        Even when a federal claim has been procedurally defaulted, "[t]he bar to federal

3 review may be lifted, if 'the prisoner can demonstrate cause for the [procedural] default

4 [in state court] and actual prejudice as a result of the alleged violation of federal law.' "

5 Maples v. Thomas, 132 S.Ct. 912, 922, 181 L. Ed. 2d 807 (2012) (quoting Coleman, 501

6 U.S. at 750, 746-47); see also Schneider v. McDaniel, 674 F.3d 1144, 1153 (9th Cir.

7 2012). Adequate "cause" for a default must be an "external" factor that cannot fairly be

8 attributed to the petitioner. Coleman, 501 US. at 753.

9                       a.     Cause

10        In Coleman, the court noted that attorney error which rises to the level of

11 ineffective assistance of counsel is considered "cause" within the meaning of this rule.

12 Coleman, 501 U.S. at 753-54. This is because a defendant has a right to effective

13 assistance of counsel under the Sixth Amendment, and a violation of that must be seen

14 as an external factor, and thus the error must be imputed to the state. Id.; Murray, 477

15 U.S. at 488. Here, Petitioner has alleged a Sixth Amendment right to effective counsel

16 claim. He asserts that appellate counsel, despite his requests, did not pursue his claims

17 on direct appeal. (See Pet. at 4.) The Court shall assume, without deciding, that

18 Petitioner has shown cause for the procedural default.

19                       b.     Prejudice

20        In addition to cause, Petitioner must show prejudice to overcome a procedural

21 bar. In order to establish prejudice that can overcome a procedural default, Petitioner

22 must show "not merely that the errors at his trial created a possibility of prejudice, but

23 that they worked to his actual and substantial disadvantage, infecting his entire trial with

24 error of constitutional dimensions." See United States v. Frady, 456 U.S. 152, 170, 102

25 S. Ct. 1584, 71 L. Ed. 2d 816 (1982) (discussing prejudice where defendant failed to

26 object to jury instructions in proceeding under 28 U.S.C. § 2255); Schneider v. McDaniel,

27 674 F.3d 1144, 1153 (9th Cir. 2012). "Prejudice [to excuse a procedural default] is actual

28 harm resulting from the alleged error." Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir.

1    1998).

2                          1.      Right to a Speedy Trial

3           Petitioner cannot establish prejudice from a failure to present his first claim that

4    his federal right to a speedy trial was violated.

5           "The Sixth Amendment guarantees that [i]n all criminal prosecutions, the accused

6    shall enjoy the right to a speedy ... trial." Vermont v. Brillon, 556 U.S. 81, 89, 129 S. Ct.

7    1283, 173 L. Ed. 2d 231 (2009) (citations and internal quotation marks omitted,

8    alterations in original); Doggett v. United States, 505 U.S. 647, 651, 112 S. Ct. 2686, 120

9    L. Ed. 2d 520 (1992); Barker v. Wingo, 407 U.S. 514, 515, 92 S. Ct. 2182, 33 L. Ed. 2d

10   101 (1972). The court must balance four factors in determining whether there has been

11   a violation of the right to a speedy trial: (1) the length of the delay; (2) the reason for the

12   delay; (3) whether the defendant asserted the right to a speedy trial; and (4) whether the

13   defendant suffered prejudice as a result of the delay. See Doggett, 505 U.S. at 651

14   (citing Barker, 407 U.S. at 530). No one factor is necessary or sufficient and there is no

15   affirmative demonstration of prejudice necessary to prove a violation of the right to a

16   speedy trial; instead, the four related factors "must be considered together with such

17   other circumstances as may be relevant." Moore v. Arizona, 414 U.S. 25, 26, 94 S. Ct.

18   188, 38 L. Ed. 2d 183 (1973) (per curiam) (citation omitted).

19          The Supreme Court split the first inquiry, the length of delay, into two steps. First,

20   in order to trigger a full speedy trial analysis, "an accused must allege that the interval

21   between accusation and trial has crossed the threshold dividing ordinary from

22   'presumptively prejudicial' delay." Doggett, 505 U.S. at 651-52. If this threshold is not

23   met, the court does not proceed with the other Barker factors. United States v. Beamon,

24   992 F.2d 1009, 1012 (9th Cir. 1993). The Supreme Court has observed that courts

25   generally have found delays approaching one year sufficient to trigger the Barker inquiry.

26   Doggett, 505 U.S. at 652 n.1. The Ninth Circuit has found a six-month delay to constitute

27   a "borderline case" sufficient to trigger an inquiry into the remaining Barker factors, see

28   United States v. Valentine, 783 F.2d 1413, 1417 (9th Cir. 1986), although it also has

1 observed that there is a general consensus among the courts of appeals that eight

2 months constitutes the threshold minimum. United States v. Gregory, 322 F.3d 1157,

3 1162 n.3 (9th Cir. 2003).

4      If the delay passes this minimum threshold, then the court must consider "as one

5 factor among several, the extent to which the delay stretches beyond the bare minimum

6 needed to trigger judicial examination of the claim." Doggett, 505 U.S. at 652; see also

7 Brillon, 129 S. Ct. at 1287 (overall delay of nearly three years between arrest and trial

8 triggered Barker evaluation of reasons for delay); United States v. Mendoza, 530 F.3d

9 758, 762 (9th Cir. 2008) ("If the length of delay is long enough to be considered

10 presumptively prejudicial, an inquiry into the other three factors is triggered."). In other

11 words, the first Doggett/Barker factor directs that if the period between accusation and

12 trial is sufficiently long to be presumptively prejudicial, the court must then inquire further

13 as to all four factors.

14      In reviewing the factors, the court must consider "whether the government or the

15 criminal defendant is more to blame" for the delay. Doggett, 505 U.S. at 651. Deliberate

16 delay by the government "'to hamper the defense' weighs heavily against the

17 prosecution." Brillon, 129 S. Ct. at 1290 (quoting Barker, 407 U.S. at 531). A more

18 neutral reason such as negligence should be considered as well, although its weight

19 should be less heavy. Barker, 407 U.S. at 531. "[A] valid reason, such as a missing

20 witness, should serve to justify appropriate delay." Id. "In contrast, delay caused by the

21 defense weighs against the defendant under standard waiver doctrine." Brillon, 129 S.

22 Ct. at 1290. Because defense attorneys act as a defendant's agent, and are not state

23 actors, "delay caused by the defendant's counsel is also charged against the defendant"

24 whether counsel is privately retained or appointed by the state. Id. at 1290-91. The Ninth

25 Circuit considers the reason for delay to be the focal point of the inquiry. See United

26 States v. King, 483 F.3d 969, 976 (9th Cir. 2007) (reasons for delay weigh heavily

27 against finding a Sixth Amendment violation where district judge granted defendant's

28 requests for continuances, defendant was explained his right to a speedy trial before

1    agreeing to continuances, the case was extraordinarily complex, and defendant

2    substituted a new attorney halfway through the proceedings).

3          Here, Petitioner asserts that the trial court violated his right to a speedy trial by

4    denying his motion to dismiss for failure to retry him within sixty days of the grant of his

5    federal petition for writ of habeas corpus. However, as described above, a delay of sixty

6    days does not implicate Petitioner's federal right to a speedy trial. To the extent that

7    Petitioner is claiming that the delay violated his right to a speedy trial under California

8    law, the claim must fail. Errors in the application of state law do not state a federal

9    question cognizable in federal habeas corpus. Wilson v. Corcoran, 131 S. Ct. 13, 16,

10    178 L. Ed. 2d 276 (2010) ("[I]t is not the province of a federal habeas court to reexamine

11    state-court determination on state-law questions.") (quoting Estelle v. McGuire, 502 U.S.

12    62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)) (internal quotation marks omitted).

13          In examining the record, Petitioner was granted habeas relief by the United States

14    District Court on April 12, 2007. Trial commenced on November 17, 2008, over a year

15    and a half later. (See Rep. Tr. at 1-3.) The delay in Petitioner's case is presumptively

16    prejudicial and triggers the consideration of the factors set forth above. Doggett v. U.S.,

17    505 U.S. at 652 n.1.

18          In reviewing the record, with regard to the second factor, i.e., reason for the delay,

19    it does not appear to weigh in Petitioner's favor. On July 23, 2007, Petitioner filed a

20    motion to dismiss based on the delay to bring Petitioner back to court and appoint him

21    an attorney. (See Rep. Tr. at 370.) However, the trial court denied the motion citing

22    California Penal Code § 1382, on August 7, 2017. (Id. at 394.) After the hearing, it

23    appears that Petitioner, through his counsel, continued the matter, including vacating a

24    November 26, 2007 trial date while procuring Petitioner's file and trial transcripts to

25    prepare for trial. (Id. at 395, 400.) Further, on May 23, 2008, Petitioner filed a motion to

26    continue the June 9, 2008 trial date to perform further discovery. (Id. at 409-413.) The

27    motion was granted and the jury trial was scheduled for August 18, 2008. (Id. at 414.)

28    The trial was again continued to September 30, 2008, at which time defense counsel

1   informed the court that he was not ready to begin trial. (<u>Id.</u> at 440.) Ultimately, the jury

2   trial was moved to November 17, 2008, and proceeded on that date. (<u>Id.</u> at 441)

3   Accordingly, the record demonstrates that defense counsel's need to prepare for trial

4   was the primary reason for the delay. Further, with regard to the third factor, the

5   assertion of the right to a speedy trial, Petitioner stopped asserting the right after the

6   motion to dismiss was filed. After that time, the defense either requested or consented to

7   delaying the trial. The third factor does not weigh in Petitioner's favor.

8         The final factor, i.e., prejudice, does not weigh in Petitioner's favor. The Supreme

9   Court has identified three types of prejudice caused by excessive delay: (1) oppressive

10   pretrial incarceration; (2) anxiety and concern of the accused; and (3) impairment of the

11   defense. <u>Barker</u>, 407 U.S. at 532. As Petitioner was seeking re-trial and had already

12   spent significant time in custody, the much shorter time spent in custody waiting for the

13   second trial likely had little additional impact on the prejudice factors listed above. With

14   regard to the impairment of the defense based on witnesses fading memory, over seven

15   years passed from the criminal act until his conviction was overturned and lead to retrial.

16   The additional delay attributed to postponing the second trial was not likely a substantial

17   factor impairing Petitioner's defense.

18         For the reasons discussed above, the Court finds that Petitioner would not be

19   successful in his claim that his federal speedy trial rights were violated. As the claim

20   would not be successful, Petitioner is unable to show prejudice from his appellate

21   counsel's failure to present the claim on direct appeal.

22                       2.       Right to English Speaking Jurors

23         Petitioner next asserts that his Sixth Amendment rights were violated because a

24   juror stated "in broken English" that she could not understand what was being stated.

25   (Pet. at 6.) Petitioner claims that the Sixth Amendment should require that all jurors

26   understand the language in which the trial is conducted. (<u>Id.</u>) While the Sixth

27   Amendment ensures the right to a unbiased jury (See <u>Irvin v. Dowd</u>, 366 U.S. 717, 722

28   (1961)) and that the jurors be representative of the community (<u>Taylor v. Louisiana</u>, 419

1    U.S. 522, 538 (1975)), the Court is unaware of any Supreme Court authority requiring

2    jurors to understand English. Had Petitioner's counsel presented this claim on appeal,

3    this Court could not grant relief under § 2254(d)(1), as the Supreme Court has not

4    provided prior decisions providing a governing legal principle to the issue before the

5    state court. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003).  As Petitioner cannot show

6    that the denial of this claim would be an unreasonable application of, clearly established

7    Federal law, as determined by the Supreme Court of the United States, he is unable to

8    show that he was prejudiced by the failure to present this claim on direct appeal.

9                    3.      Right to Jurors' Personal Information

10   Petitioner also asserts that the trial court violated his federal constitutional rights

11   in not releasing juror contact information to allow him to determine if one of the jurors did

12   not speak English, as he previously contends. Petitioner provides no federal authority in

13   support of his claim. Like Petitioner's claim for a English speaking jury, the Court is

14   unaware of Supreme Court authority requiring jurors identifying information to be

15   disclosed. California Code of Civil Procedure § 237 governs requests to unseal personal

16   juror information. However, issues of state law are not generally reviewable in federal

17   habeas corpus proceedings. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475,

18   479, 116 L. Ed. 2d 385 (1991). As such, Petitioner cannot show denial of this claim

19   would be an "unreasonable application of, clearly established Federal law, as

20   determined by the Supreme Court of the United States," and he is unable to show that

21   he was prejudiced by the failure to present this claim on direct appeal. <u>See, e.g.</u>, <u>Serna</u>

22   <u>v. McDonald</u>, 2014 U.S. Dist. LEXIS 34547 (E.D. Cal. Mar. 14, 2014).

23                    c.      Miscarriage of Justice

24   Finally, Petitioner can avoid a procedural default if he can demonstrate that a

25   fundamental miscarriage of justice would result from the default. The United States

26   Supreme Court has limited the "miscarriage of justice" exception to petitioners who can

27   show that "a constitutional violation has probably resulted in the conviction of one who is

28   actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 851, 130 L. Ed. 2d 808

1  (1995). "In order to pass through <u>Schlup</u>'s gateway, and have an otherwise barred

2  constitutional claim heard on the merits, a petitioner must show that, in light of all the

3  evidence, including evidence not introduced at trial, "it is more likely than not that no

4  reasonable juror would have found petitioner guilty beyond a reasonable doubt."" <u>Majoy</u>

5  <u>v. Roe</u>, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting <u>Schlup</u>, 513 U.S. at 327. In

6  applying this standard, "A petitioner need not show that he is "actually innocent' of the

7  crime he was convicted of committing; instead, he must show that ""a court cannot have

8  confidence in the outcome of the trial."" <u>Majoy</u>, 296 F.3d at 776, quoting <u>Carriger v.</u>

9  <u>Stewart</u>, 132 F.3d 463, 478 (9th Cir. 1987) (en banc), quoting <u>Schlup</u>, 513 U.S. at 316.

10  Petitioner has not presented any credible evidence to undermine the factual

11  assertions that form the basis of his convictions. Without presenting reliable, credible

12  evidence of his innocence, Petitioner has not made a sufficient showing of actual

13  innocence to serve as an equitable exception to procedural default. <u>Schlup</u>, 513 U.S. at

14  324 ("To be credible, such a claim requires petitioner to support his allegations of

15  constitutional error with new reliable evidence — whether it be exculpatory scientific

16  evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not

17  presented at trial. Because such evidence is obviously unavailable in the vast majority of

18  cases, claims of actual innocence are rarely successful.") Petitioner has not shown that it

19  is more likely than not that no reasonable juror would have found him guilty beyond a

20  reasonable doubt in light of the alleged errors at trial described above. <u>Id.</u> at 314-15.

21  Accordingly, Petitioner is procedurally barred from presenting his first, second and third

22  claims.

23  **B.    Claim 4 – Felony Murder Instruction**

24  Petitioner, in his last claim, asserts that the trial court erred by instructing the jury

25  on second degree felony murder on the underlying felony of discharging a firearm in a

26  grossly negligent manner.

27  1.    State Court Decision

28  Petitioner presented this claim by way of direct appeal to the California Court of

1    Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

2    appellate court and summarily denied in a subsequent petition for review by the

3    California Supreme Court. (See Lodged Docs. 1, 5.) Because the California Supreme

4    Court's opinion is summary in nature, this Court "looks through" that decision and

5    presumes it adopted the reasoning of the California Court of Appeal, the last state court

6    to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3

7    (1991) (establishing, on habeas review, "look through" presumption that higher court

8    agrees with lower court's reasoning where former affirms latter without discussion); see

9    also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts

10   look to last reasoned state court opinion in determining whether state court's rejection of

11   petitioner's claims was contrary to or an unreasonable application of federal law under

12   28 U.S.C. § 2254(d)(1)).

13        In denying Petitioner's claim, the California Court of Appeal explained:

14   I. Facts

15   A. Instructions

16
17        The trial court instructed the jurors that defendant had been
     prosecuted for second degree murder[3] under two theories: malice murder
18   and felony murder.

19        Under the malice-murder theory, the court instructed with
     CALCRIM No. 520:
20

21        "The defendant's charged with murder. To prove that the
          defendant is guilty of this crime, the People must prove that:
22        Number One, the defendant committed an act that caused
          the death of another person; Number Two, *when the*
23        *defendant acted, he had a state of mind called malice*
          *aforethought;* and Number Three, he killed without lawful
24        justification.

25        "There are two kinds of malice aforethought: Express malice
          and implied malice. Proof of either is sufficient to establish
26        the state of mind required for murder.

27   ───────────────────
          [3] Defendant had been acquitted of first degree murder and was therefore not charged with that
28   crime at this trial.

> "The defendant acted with express malice if he unlawfully intended to kill. The defendant acted with implied malice if he intentionally committed an act; Number Two, the natural and probable consequences of the act were dangerous to human life; Number Three, *at the time he acted he knew his act was dangerous to human life*; and Number Four, he deliberately acted with conscious disregard for human life." (Italics added.)

Under the felony-murder theory, the court instructed with CALCRIM No. 541A:

> "To prove that the defendant is guilty of ... second degree murder under this theory, the People must prove that: Number One, the defendant committed the offense of shooting a firearm in a grossly negligent manner; Number Two, the defendant intended to commit the offense of shooting a firearm in a grossly negligent manner; Number Three, the defendant did an act that caused the death of another person; and Number Four, the act causing the death and the offense of shooting a firearm in a grossly negligent manner were part of one continuous transaction."

The court then instructed with CALCRIM No. 970 on the underlying felony of shooting a firearm in a grossly negligent manner (§ 246.3):

> "To prove that the defendant is guilty of this crime, the People must prove that: Number One, the defendant intentionally shot a firearm; Number Two, *the defendant did the act with gross negligence*; and Number Three, the shooting could have resulted in the injury or death of a person.

> "Gross negligence involves more than ordinary carelessness, inattention or mistaken judgment. A person acts with gross negligence when: Number One, he or she acts in a reckless way that creates a high risk of death or great bodily injury; and Number Two, *a reasonable person would have known that acting in that way would create such a risk.* In other words, a person acts with gross negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act." (Italics added.)

…

II. <u>Analysis</u>

33

1

A. <u>Malice Murder and Felony Murder</u>

2

"'Second degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder. (§§ 187, subd. (a), 189; [citation].)' [Citation.]" (<u>Chun</u>, supra, 45 Cal.4th at p. 1181.) "Ill will toward, or hatred of, the victim are not prerequisites of malice as that term is used in the statutory definition of murder. [Citations.]" (<u>People v. Nieto Benitez</u> (1992) 4 Cal.4th 91, 103.) Malice may be express or implied. Express malice exists "when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) "Malice is implied when the killing is proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'" (<u>People v. Knoller</u> (2007) 41 Cal.4th 139, 143.) "'[A] finding of implied malice depends upon a determination that the defendant actually appreciated the risk involved, i.e., a *subjective* standard. [Citation.]' [Citation.] [¶] It is the '"conscious disregard for human life"' that sets implied malice apart from gross negligence. [Citations.] 'Even if the act results in a death that is accidental, as defendant contends was the case here, the circumstances surrounding the act may evince implied malice. [Citations.]' [Citation.]" (<u>People v. Contreras</u> (1994) 26 Cal.App.4th 944, 954.) "Implied malice ... involves an element of wantonness which is absent in gross negligence." (<u>People v. Watson</u> (1981) 30 Cal.3d 290, 296.) "The very nature of implied malice ... invites consideration of the circumstances preceding the fatal act. [Citations.]" (<u>People v. Nieto Benitez</u>, supra, at p. 107.) Malice "'may be implied when a person, knowing that his [or her] conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life.' [Citations.]" (<u>People v. Watson</u>, supra, at p. 296.) "In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (<u>People v. Knoller</u>, supra, at p. 143.)

"A defendant may also be found guilty of murder under the felony-murder rule. The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state.... Second degree felony murder is 'an unlawful killing in the course of the commission of a felony that is inherently dangerous to human life but is not included among the felonies enumerated in section 189 ....' [Citation.] [¶] ... 'The second degree felony-murder rule eliminates the need for the prosecution to establish the mental component [of implied malice]. The justification therefor is that, when society has declared certain inherently dangerous conduct to be felonious, a defendant should not be allowed to excuse himself by saying he was unaware of the danger to life because, by declaring the conduct to be felonious, society has warned him of the risk involved. The physical requirement, however, remains the same; by committing a felony inherently dangerous to life, the defendant has committed "an act, the

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

natural consequences of which are dangerous to life" [citation], thus satisfying the *physical* component of implied malice.' [Citation.]" (Chun, supra, 45 Cal.4th at p. 1182.) "The felony-murder rule renders irrelevant [implied] malice, but it does not render malice itself irrelevant. Instead, the felony-murder rule 'acts as a substitute' for [implied] malice. [Citation.] It simply describes a different form of malice under section 188. 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' [Citation.]" (Id. at p. 1184.)

B. Chun and The Merger Doctrine

In Chun, supra, 45 Cal.4th 1172, the Supreme Court reassessed the historic merger doctrine adopted in People v. Ireland (1969) 70 Cal.2d 522, and held that all assaultive-type crimes merge with the charged homicide and cannot be the basis for a second degree felony-murder instruction. (Chun, supra, at p. 1178.) Accordingly, under Chun, as the parties in this case agree, defendant's assaultive-type behavior merged with the homicide and was not a proper basis for a felony-murder instruction, the giving of which was error.

Chun also established the standard for reviewing cases such as this one, where the trial court instructed the jury with an invalid felony-murder theory but also a valid malice-murder theory: the instructional error is harmless if the record demonstrates beyond a reasonable doubt that the jury based its verdict on a legally valid theory (Chun, supra, 45 Cal.4th at p. 1203), or "[i]f other aspects of the verdict or the evidence leave no reasonable doubt that the jury made the finding necessary" for a legally valid theory (id. at p. 1205). Thus, to find the error harmless, we must determine beyond a reasonable doubt that this jury actually made the necessary findings under a valid theory, or that a reasonable jury would have made the necessary findings under a valid theory. (People v. Concha (2010) 182 Cal.App.4th 1072, 1089.) In other words, we must be confident that if this jury or a reasonable jury had considered a valid theory, it would have convicted defendant.

C. The Verdict and the Evidence

In cases where the felony underlying the felony-murder theory requires the equivalent of malice, the murder verdict alone, even if made under the felony-murder theory, demonstrates that the jurors found malice. (See, e.g., People v. Hach (2009) 176 Cal.App.4th 1450, 1456-1458 [error in instructing on felony murder was harmless because any juror who relied on felony murder necessarily found defendant willfully shot at an occupied vehicle, meaning he did so knowing the danger and with conscious disregard for life; the underlying felony (§ 246) required that the person "maliciously and willfully discharge[d] a firearm"].) But in this case, the felony underlying the prosecution's felony-murder theory was section 246.3, shooting a firearm in a grossly negligent manner, which requires

"'(1) the defendant unlawfully discharged a firearm; (2) the defendant did so intentionally; (3) the defendant did so in a *grossly negligent* manner which could result in the injury or death of a person.' [Citation.]" (<u>People v. Overman</u> (2005) 126 Cal.App.4th 1344, 1361, 1363.) [4] Unlike implied malice, in which a subjective standard is applied, gross negligence is found "'by applying an *objective* test: if a *reasonable person* in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness. [Citation.]'" (People v. Watson, supra, 30 Cal.3d at p. 296.) "'Gross negligence, as a basis for criminal liability, requires a showing that the defendant's act was "'such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.'" [Citation.]'" (<u>People v. Ramirez</u>, supra, 45 Cal.4th at p. 989.)

Because section 246.3 does not require a finding that the defendant subjectively appreciated the risk involved, as required for implied malice (<u>People v. Knoller</u>, supra, 41 Cal.4th at p. 143), the murder verdict in this case does not in itself demonstrate that the jurors found implied malice.

The People, however, contend the evidence that defendant intentionally shot Stephanie in the head at very close range supported malice murder. We agree that this evidence could establish a conscious disregard for life, if not an intent to kill. (<u>See, e.g.</u>, <u>People v. Halvorsen</u> (2007) 42 Cal.4th 379, 439 [sudden gunshot to head or neck at close range strongly indicates an intent to kill]; <u>People v. Smith</u> (2005) 37 Cal.4th 733, 742 ["act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice"]; <u>People v. Hawkins</u> (1995) 10 Cal.4th 920, 955-957 [deliberate intent to kill is also shown by firing at vital body parts such as the head and neck and evidence of an execution-style killing to the head and neck from close

---

[4] "Section 246.3 was enacted in 1988 ... to address the 'growing number of urban California residents engaged in the dangerous practice of discharging firearms into the air during festive occasions.' [Citation.] ... Section 246.3 thus 'presupposes that there are people in harm's way.... [I]t must appear that the defendant's act "actually had the potential for culminating in personal injury or death."' [Citation.]" (<u>People v. Overman</u>, supra, 126 Cal.App.4th at pp. 1361, 1363 [because defendant fired rifle in general vicinity of several persons, he fired his rifle under circumstances that had potential for resulting in personal injury or death, and jury could reasonably have inferred defendant fired rifle under circumstances showing a grossly negligent disregard for human life].) "The risk element of section 246.3 was included to ensure that the statute would not apply to hunting or target practice in remote locations, posing no foreseeable risk of human injury, based on abstract theories of criminal negligence. The risk element requires the likely presence of people in the area, not the actual presence of a specific person." (<u>People v. Ramirez</u> (2009) 45 Cal.4th 980, 987.) "It is beyond dispute that shooting a gun in a commercial area where people are present constitutes gross negligence under this definition." (<u>People v. Alonzo</u> (1993) 13 Cal.App.4th 535, 540 [shooting gun into the air in a commercial area of city presented possibility of hitting member of public; this was precisely the type of behavior the statute was intended to deter].)

range is sufficient alone to support a finding of premeditation and deliberation], overruled on other grounds in People v. Blakeley (2000) 23 Cal.4th 82, 89.)

But, as defendant counters, the evidence that he shot Stephanie at very close range was not conclusive. The pathologist testified that Stephanie's wound could also have been a distant-range wound that exhibited a stellate pattern due to the nature of the bony prominence over the eye. The pathologist believed it was a contact/near-contact wound due to the hemorrhage, but he could not rule out the other. Also, the gunshot residue particle on Stephanie's hand did not establish that defendant shot her at extremely close range. This uncertainty means we cannot conclude beyond a reasonable doubt that reasonable jurors would necessarily have found that defendant put the gun to Stephanie's head and intentionally fired it, rather than intentionally shot at her to scare her (as he had done with Katina) and the shot ended up hitting her—the scenario proposed by the prosecutor to support the felony-murder theory.

Nevertheless, other evidence in this case convinces us beyond a reasonable doubt that the jurors either did find malice under a valid theory or would have found malice if they had been required to consider a valid theory.

First, we note that the jury's murder verdict establishes that the jurors entirely rejected defendant's theory that Stephanie had the gun and was shot as defendant attempted to defend either her or himself from getting shot.

Second, the jurors who did not rely on the erroneous felony-murder theory necessarily found malice, either express or implied, under a valid malice-murder theory to reach a murder verdict.

Finally, any jurors who did rely on the erroneous felony-murder theory, although required only to find gross negligence, would have found malice if they had been required to do so. Any jurors who relied on the felony-murder theory necessarily found that defendant intentionally fired the gun in a grossly negligent manner, which means a reasonable person would have known defendant's act endangered Stephanie's life. The prosecutor's scenario under this theory was that defendant intentionally fired the gun at Stephanie with the intent to merely scare her and the shot instead hit her. He shot straight at her head, not just in her general vicinity, in the extreme darkness. This scenario supported not just felony murder, but a finding of implied malice. (See People v. Chun, supra, 45 Cal.4th at p. 1205 [error in instructing the jury on felony murder is harmless when, on the evidence, no juror could find felony murder without also finding implied malice].) Under this scenario, we are convinced the jurors would have found, if asked to consider the question, that defendant knew he was engaging in conduct that endangered Stephanie's life. (See People v. Laws (1993) 12 Cal.App.4th 786, 793-794 ["if one simply wishes to scare

another by shooting a gun in the direction of the other person intending the bullet to just miss that person (i.e., without the intent to kill or injure), the shooter can be guilty of murder if, accidentally, the bullet strikes and kills the person"].)

This is all that is required for implied malice, but other circumstances further support the implied malice finding. Defendant was no stranger to guns or domestic violence. He kept two guns in the house and carried one in his truck, and he went shooting with John, who trained him. He was likely familiar and competent with a gun. The nature of Stephanie's head wound and the absence of defensive wounds showed she did not have the opportunity or ability to struggle or move away from the shot. Defendant was prone to using a gun against women who tried to leave him, and he resorted to it again when Stephanie attempted to leave him. Despite knowing his conduct would endanger Stephanie's life, defendant proceeded with conscious disregard for her life. This disregard was again demonstrated when he left the gravely wounded Stephanie in the house and took the time to retrieve the gun from the front yard and bury it in the back of the large lot, and to hide his bloody, dirty jacket behind the bathroom door on the opposite side of the house from where Stephanie lay dying.

Because we conclude beyond a reasonable doubt that the jurors not relying on the felony-murder theory did find malice, and the jurors relying on the erroneous felony-murder theory would have found implied malice, any error in instructing on felony murder was harmless beyond a reasonable doubt.

People v. McKinstry, 2011 Cal. App. Unpub. LEXIS 1549, 45-47, 55-67 (Cal. App. 5th Dist. Mar. 4, 2011).

            2.      Relevant Legal Standard

This Court's review of Petitioner's claim of state instructional error is "limited to deciding whether [his] conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); 28 U.S.C. § 2241. In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must first conclude that the alleged error was of constitutional magnitude. See California v. Roy, 519 U.S. 2, 117 S. Ct. 337, 136 L. Ed. 2d 266 (1996).

In order to grant federal habeas relief on the basis of faulty jury instructions, the Court must conclude that the alleged error "had substantial and injurious effect or influence in determining the jury's verdict." Roy, 519 U.S. at 5; Brecht, 507 U.S. at 637.

1   Federal habeas relief is warranted only if the Court, after reviewing the record, has

2   "grave doubt" as to the error's effect. Stanton v. Benzler, 146 F.3d 726, 728 (9th Cir.

3   1998). "The burden of demonstrating that an erroneous instruction was so prejudicial

4   that it will support a collateral attack on the constitutional validity of a state court's

5   judgment is even greater than the showing required to establish plain error on direct

6   appeal." Henderson v. Kibbe, 431 U.S. 145, 154, 97 S. Ct. 1730, 52 L. Ed. 2d 203

7   (1977). The trial court's error in omitting a jury instruction is less likely to be prejudicial

8   than the trial court's misstatement of the law. Henderson, 431 U.S. at 155; see also

9   Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (habeas petitioner whose claim

10  involves a failure to give a particular instruction bears an especially heavy burden).

11      To evaluate the effect of jury instructions, the Court must look at the context of the

12  entire trial and overall charge to the jury. Estelle, 502 U.S. at 72; Prantil v. California, 843

13  F.2d 314, 317 (9th Cir. 1988). They may not be judged in artificial isolation. Estelle, 502

14  U.S. at 72. In addition, a reviewing court's principal constitutional inquiry is whether there

15  is a reasonable likelihood that the jury applied the challenged instructions in a way that

16  violates the Constitution. See id.

17      While a state is generally free to define the elements of an offense, once the state

18  has defined the elements, due process requires that the jury be instructed on each

19  element and instructed that they must find each element beyond a reasonable doubt.

20  Francis v. Franklin, 471 U.S. 307, 313, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985); In re

21  Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); United States v.

22  Perez, 116 F.3d 840, 847 (9th Cir. 1997); Stanton, 146 F.3d at 728.

23      It necessarily follows, therefore, that constitutional trial error occurs when a jury

24  makes a guilty determination on a charged offense without a finding as to each element

25  of the offense. According to the Supreme Court, a jury instruction that omits an element

26  of the offense constitutes such an error. Neder v. United States, 527 U.S. 1, 8, 119 S. Ct.

27  1827, 144 L. Ed. 2d 35 (1999). However, such an error "does not necessarily render a

28  criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or

1   innocence." Id. at 9. Provided that such an error occurred, Petitioner's conviction can

2   only be set aside if the error was not harmless under Chapman v. California, 386 U.S.

3   18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967); Neder, 527 U.S. at 15. Under the Chapman

4   harmless error test, it must be determined "beyond a reasonable doubt" whether "the

5   error complained of did not contribute to the verdict obtained." Chapman, 386 U.S. at 24.

6       Here, Petitioner contends the trial court erred in instructing the jury on the felony-

7   murder theory of murder which only required a showing of gross negligence and not

8   malice. The trial court noted that the felony-murder instructions were incorrect and that

9   the Court could not rely upon the jury's verdict to establish malice, a required element for

10  murder. People v. McKinstry, 2011 Cal. App. Unpub. LEXIS 1549 at 55-67 ("Because

11  section 246.3 does not require a finding that the defendant subjectively appreciated the

12  risk involved, as required for implied malice, the murder verdict in this case does not in

13  itself demonstrate that the jurors found implied malice.") (citation omitted).

14      However, the state court held that the instructional error was harmless.

15  Respondent argues that the verdict illustrated that the jury rejected Petitioner's theory

16  that he was attempting to prevent himself or the victim from being shot. (Answer at 26.)

17  The state court explained that any juror who relied on the felony-murder theory would

18  have found malice rather than gross negligence if they had been required to do so. The

19  state court relied on the fact that Petitioner shot at the victim's head, which inferred that

20  he was firing the gun in a manner that would show that he acted deliberately with

21  conscious disregard for life in shooting at critical area of the victim's body. In addition to

22  the act of shooting the victim, Petitioner's prior conviction involving shooting in the

23  direction of a former girlfriend and his actions after the incident to hide the gun

24  demonstrated his express or implied malice required for second degree murder. Upon

25  review, the state court's holding was a reasonable application of federal law as the

26  instructions, while incorrect, were harmless. Chapman, 386 U.S. at 24. Based on the

27  evidence presented, Petitioner has not shown beyond a reasonable doubt that the

28  instructional error contributed to the verdict obtained. Id.

1    Accordingly, the Court is not convinced that the trial court committed an

2  instructional error such that the resulting conviction violated due process. See Estelle,

3  502 U.S. at 72. It is recommended that Petitioner's fourth claim for relief be denied.

4  **IV.    RECOMMENDATION**

5    Accordingly, it is hereby recommended that the petition for a writ of habeas

6  corpus be DENIED with prejudice.

7    This Findings and Recommendation is submitted to the assigned District Judge,

8  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

9  being served with the Findings and Recommendation, any party may file written

10  objections with the Court and serve a copy on all parties. Such a document should be

11  captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

12  to the objections shall be served and filed within fourteen (14) days after service of the

13  objections. The parties are advised that failure to file objections within the specified time

14  may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153

15  (9th Cir. 1991).

16

17  IT IS SO ORDERED.

18    Dated:  __October 28, 2014__      _/s/ Michael J. Seng_

19                    UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

27

28

41